NO. 25-8077

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON, EUGENE DIVISION

No. 6:25-cv-01748-AA
The Honorable Anne Aiken, United States District Court Judge

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

NICHOLAS W. BROWN
Attorney General

WILLIAM MCGINTY
KELLY PARADIS
Deputy Solicitors General
LUCY WOLF
ALEXIA DIORIO
MOLLY POWELL
Assistant Attorneys General
800 Fifth Avenue, Suite 2000

Seattle, WA 98104-3188
206-464-7744
william.mcginty@atg.wa.gov
kelly.paradis@atg.wa.gov
lucy.wolf@atg.wa.gov
alexia.diorio@atg.wa.gov
molly.powell@atg.wa.gov

*Attorneys for Plaintiff-Appellee State Of Washington*

# TABLE OF CONTENTS

I.    INTRODUCTION ..........................................................................1

II.    STATEMENT OF THE ISSUE.....................................................3

III.   STATEMENT OF THE CASE .......................................................4

    A.    Congress Created and Funded PREP and SRAE to
          Reduce Teen Pregnancy and STIs and to Prepare
          Youth for Adulthood ......................................................4

    B.    Plaintiff States Have Successfully Implemented
          PREP and SRAE for Many Years ..................................6

    C.    Plaintiff States Strive to Ensure that Education Is
          Inclusive of All Students .............................................8

    D.    HHS Abruptly Reversed its Position and Now Seeks
          to Prohibit PREP and SRAE Grant Recipients from
          Including "Gender Ideology" in State Curricula ......................10

    E.    Plaintiff States Filed Suit and Moved for a Preliminary
          Injunction to Prevent Numerous Irreparable Harms ................15

    F.    The District Court Entered an Injunction Enjoining
          HHS from Imposing or Enforcing the Gender
          Conditions and Materially Similar Terms and
          Conditions..................................................................20

    G.  Proceedings Since Entry of the Preliminary Injunction.............22

IV.   SUMMARY OF THE ARGUMENT .............................................23

V.    ARGUMENT .................................................................................25

    A.    Standard of Review ..............................................................25

B. The Scope of This Appeal Is Limited to the Breadth of the Injunction; HHS Has Forfeited All Other Claims.................................................26

C. Plaintiff States' Requested Injunction Is Appropriately Tailored .........................................27

 1. HHS misconstrues the preliminary injunction.................28

 2. The injunction against "materially similar" policies was supported by fact and law and not an abuse of discretion...................................31

D. A Categorical Prohibition on "Gender Ideology" Content Conflicts with the PREP and SRAE Enabling Statutes .................................................38

 1. This Court should disregard HHS's statutory arguments as beyond the scope of the appeal .................38

 2. HHS's statutory arguments fail on their merits ...............40

VI. CONCLUSION.................................................................51

# TABLE OF AUTHORITIES

## Cases

*Alaska Cntr. for Env't v. Browner*,
20 F.3d 981 (9th Cir. 1994) ................................................................ 25

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......................................................................... 36

*Church of the Holy Light of the Queen v. Holder*,
443 F. App'x 302 (9th Cir. 2011) ...................................................... 34

*City of Emeryville v. Robinson*,
621 F.3d 1251 (9th Cir. 2010) ........................................................... 51

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........................................................................ 47, 48

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) .............................................................. 26

*Fed. Election Comm'n v. Furgatch*,
869 F.2d 1256 (9th Cir. 1989) ........................................................... 30

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ....................................................... 35, 38

*Greenwood v. FAA*,
28 F.3d 971 (9th Cir. 1994) ............................................................... 27

*Gulf Oil Corp. v. Brock*,
778 F.2d 834 (D.C. Cir. 1985) ...................................................... 35, 36

*Hous. Auth. of City & Cnty. of San Francisco v. Turner*,
No. 25-cv-08859-JST, 2025 WL 2961794 (N.D. Cal. Oct. 18, 2025) .......... 34

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025) ................................................... 33

*Indep. Towers of Wash. v. Washington*,
   350 F.3d 925 (9th Cir. 2003) ................................................................ 27, 39

*L.A. Press Club v. Noem*,
   171 F.4th 1179 (9th Cir. 2026) ................................................................... 26

*Martin Luther King, Jr. Cnty. v. Turner*,
   798 F. Supp. 3d 1224 (W.D. Wash. 2025) .................................................. 34

*Meinhold v. Dep't of Def.*,
   34 F.3d 1469 (9th Cir. 1994) ................................................................ 35, 36

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ............................................................................... 36, 37

*New York v. Trump*,
   171 F.4th 1 (1st Cir. March 2026) ........................................................ 31, 33

*Oregon v. Kennedy*,
   No. 6:25-cv-02409-MTK, 2026 WL 1048354 (D. Or. April 18, 2026) ....... 34

*Pacito v. Trump*,
   169 F.4th 895 (2026) ................................................................................... 25

*Pom Wonderful LLC v. Hubbard*,
   775 F.3d 1118 (9th Cir. 2014) .................................................................... 26

*R.I. Coal. Against Domestic Violence v. Kennedy*,
   812 F. Supp. 3d 180 (D.R.I. 2025) .............................................................. 33

*Unemployment Comp. Comm'n of Alaska v. Aragon*,
   329 U.S. 143 (1946) .................................................................................... 48

*United States v. Christie Indus., Inc.*,
   465 F.2d 1002 (3d Cir. 1972) ...................................................................... 30

*United States v. Dunkel*,
   927 F.2d 955 (7th Cir. 1991) ....................................................................... 39

iv

*United States v. Skrmetti,*
  145 S. Ct. 1816 (2025) ...................................................................... 45

## Constitutional Provisions

N.Y. Const. art. I, § 11(a) ................................................................. 9

## Statutes

42 U.S.C. § 300z ................................................................................. 4

42 U.S.C. § 710 ................................... 5, 6, 11, 41, 43, 44, 45, 47, 50

42 U.S.C. § 713 ............................... 5, 6, 11, 41, 42, 44, 45, 47, 49, 50

775 Ill. Comp. Stat. 5/1-103 ...................................................... 9, 19

Colo. Rev. Stat. § 22-1-128 ......................................................... 8, 19

Colo. Rev. Stat. § 24-34-601 ....................................................... 9, 19

Haw. Rev. Stat. § 368D-1(a) ........................................................ 9, 19

Mass. Gen. Laws ch. 151B, § 4 ................................................... 9, 19

Mass. Gen. Laws ch. 272, § 92A .................................................. 9, 19

Mass. Gen. Laws ch. 272, § 98 .................................................... 9, 19

Me. Stat. tit. 5 § 4602 .................................................................. 9, 19

Mich. Comp. Laws § 37.2302 ...................................................... 9, 19

Minn. Stat. § 363A.13 .................................................................. 9, 19

N.Y. Civ. Rights Law § 40 ........................................................... 9, 19

N.Y. Civ. Rights Law § 40-c ........................................................ 9, 19

N.Y. Comp. Codes R. & Regs. tit. 8, § 100.2 .............................. 9, 19

N.Y. Comp. Codes R. & Regs. tit. 9, § 466.13 ............................................ 9, 19

N.Y. Educ. Law § 11 ................................................................................... 9, 19

N.Y. Educ. Law § 12 ................................................................................... 9, 19

N.Y. Educ. Law § 3201-a ............................................................................ 9, 19

N.Y. Educ. Law § 801-a .............................................................................. 9, 19

N.Y. Exec. Law § 291 .................................................................................. 9, 19

N.Y. Exec. Law § 292 .................................................................................. 9, 19

N.Y. Exec. Law § 296 .................................................................................. 9, 19

N.Y. Exec. Law § 300 .................................................................................. 9, 19

Or. Rev. Stat. § 336.455 .............................................................................. 9, 19

Wash. Rev. Code § 28A.300.475 ................................................................ 8, 19

Wash. Rev. Code § 49.60.030 ..................................................................... 9, 19

## Rules

Or. Admin. R. 581-022-2050 ....................................................................... 9, 19

## Other Authorities

Affordable Care Act, Pub. L. No. 111-148 § 2953,
124 Stat. 347-352 .................................................................................... 5

DelGrosso, Schulte, and Zief, *Supporting Statewide
Implementation of Evidence-Based Teen Pregnancy Prevention
Programs: Findings from Four PREP Grantees*, OPRE Report
No. 2016-87, (Nov. 2016) ......................................................................... 5

vi

Donald B. Langille, *Teenage Pregnancy: trends, contributing factors and the physician's role*, Canadian Med. Ass'n J. (May 22, 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1867841/ .................... 4

Exec. Order No. 14,168, 90 Fed. Reg. 8615, (Jan. 20, 2025) ..................... 11, 29

Laura Baams, *Sexual and gender diversity in schools: The impact of restrictive education policies on LGBTQ+ adolescent development,* Child Development Perspectives, (January 28, 2026) ..................................................................................... 17

Maureen Rabbitte, *Sex Education in School, are Gender and Sexual Minority Youth Included? A Decade in Review*, Am. J. Sexual Educ. 15(4), 530-42 (Oct 13, 2020) .................................. 9, 15, 42, 44

N.Y. State Dep't of Educ., *A Guidance Document for Achieving the New York State Standards in Health Education* (2005) ........................... 8

N.Y. State Dep't. of Educ., *NYSED Assessment Process for Review of Local Education Agencies (LEAs) Condom Availability Plan (CAP) and Approval of the Plan for Training For School Personnel and/or Health Service Personnel Providing Personal Health Guidance to Students* (2017) ............................. 9

Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, § 912,110 Stat. 2353-2354 ............................ 5

Sandra Anti Eyiah & Adrienne Duke-Marks, *Evaluating Associations of the Personal Responsibility and Education Program (PREP) with Adolescents' Sexual Health and Relationship Advocacy*, 20 Am. J. Sexuality Educ. 1 (2025) ........................ 6

The Trevor Project, 2023 U.S. National Survey on the Mental Health of LGBTQ Young People ................................................................... 9

Theresa Neelan, et al., *The Sexual Risk Avoidance Education National Evaluation: Understanding Program Implementation Experiences*, OPRE Report 2023-307, at viii (Dec. 2023) ............................ 7

vii

## I.  INTRODUCTION

The Gender Conditions amount to a sweeping, categorical prohibition of all curricular materials, instructor notes, and classroom activities that include or reference so-called "gender ideology" in the federally funded but state administered PREP and SRAE programs. The Gender Conditions apply regardless of purpose or context and prohibit content that simply acknowledges the existence of transgender and gender-diverse populations, promotes inclusive and respectful educational environments, and directly addresses pregnancy and STI prevention or other statutory subjects. For example, the Gender Conditions even prevent Plaintiff States from informing students that transgender and gender-diverse youth can become pregnant if they have a uterus and that these youth are at higher risk of pregnancy and STIs.

HHS does not challenge the district court's conclusion that Plaintiff States are likely to succeed on their claims that the Gender Conditions violate the APA because they are contrary to the PREP and SRAE enabling statutes and because HHS's actions were arbitrary and capricious. Nor does HHS dispute that Plaintiff States are likely to succeed on their constitutional claims because the Gender Conditions are impermissibly vague, retroactive, and violate the Spending Clause and the separation of powers. HHS likewise does not challenge the

1

district court's conclusions that the Gender Conditions will inflict lasting irreparable harm in Plaintiff States. Indeed, HHS expressly disavows *any* challenge to the underlying merits and limits its appeal to "the breadth of the district court's preliminary injunction." Opening Br. at 8 n.1.

In claiming that the court's order is overbroad, however, HHS fundamentally mischaracterizes the scope of the injunction. The district court did not, as HHS contends, conclude that "no limits" could ever be placed on "gender content" in PREP and SRAE curricula. Opening Br. at 20, 32. Instead, the district court enjoined HHS from enforcing the pretextual, inaccurate, and unreasoned Gender Conditions and any "materially similar terms and conditions." ER-80–81. This language merely restricts HHS from reimposing similar prohibitions on all content that references gender identity or gender-diverse youth, even when that content furthers the goals of PREP and SRAE. The injunction does not prevent HHS from making reasoned determinations that specific lesson plans fail to meet statutory criteria or are medically inaccurate, so long as it does so in compliance with the statute and Congress's preogatives does not attempt an end-run around the preliminary injunction. Moreover, inclusion of this language was entirely appropriate given the district court's unchallenged findings that HHS's imposition of the Gender Conditions was likely not only contrary to law but also pretextual.

2

Finally, although HHS waived any challenge to the underlying merits, the district court's injunction was proper because a categorical prohibition on all gender identity content is inconsistent with the PREP and SRAE enabling statutes and Congress's intent in creating these programs. Nothing in the plain language of the statutes indicates that gender identity content can *never* be relevant to education about preventing pregnancy and STIs or preparing youth for adulthood. Indeed, curricula examples from the Plaintiff States establish just the opposite.

Simply put, the Gender Conditions are unlawful, unconstitutional, and harmful and so is any policy or rule that would accomplish the same prohibition. The district court properly exercised its discretion when it enjoined the enforcement of such conditions. This Court should affirm.

## II.    STATEMENT OF THE ISSUE

Where HHS does not appeal the district court's holding that a categorical prohibition on "gender ideology" is likely unlawful, unconstitutional, and would cause irreparable harm to the Plaintiff States, was it a proper exercise of discretion to enjoin HHS from implementing any "materially similar terms and conditions" in the future?

3

## III. STATEMENT OF THE CASE

### A. Congress Created and Funded PREP and SRAE to Reduce Teen Pregnancy and STIs and to Prepare Youth for Adulthood

Teen pregnancy and STIs are major public health issues. While the teen birth rate has declined over time, teen birth rates remain higher in the United States than other high-income countries. 8-SER-1868–70, 1876–78. Babies born to teenagers are more likely to have lower birth weights, increased infant mortality risk, and poorer cognitive development.[1] Teenage parents are less likely to graduate high school and more likely to need public assistance as adults. 8-SER-1878. STIs among young people also impose significant costs and public health concerns. STI rates in the United States reached an all-time high in 2021. 8-SER-1929. Youths aged 15 to 24 have one-half of new STI infections, despite representing only one-quarter of the sexually active population. 8-SER-1942.

To combat these public health issues, Congress has long exercised its spending authority to fund sexual health education. *See* 42 U.S.C. § 300z. In 1996, after a decade of growing concern over HIV/AIDS, Congress enacted Title V, Section 510B of the Social Security Act, which provided the framework for

---

[1] Donald B. Langille, *Teenage Pregnancy: trends, contributing factors and the physician's role*, Canadian Med. Ass'n J. (May 22, 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1867841/.

SRAE. Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, § 912,110 Stat. 2353-2354. In 2010, following a spike in teen birth rates (8-SER-2018), Congress authorized PREP as part of the Affordable Care Act, Pub. L. No. 111-148 § 2953, 124 Stat. 347-352, *codified as amended at* 42 U.S.C. § 713. PREP is one of the largest federally funded programs designed to address teen pregnancy.[2]

The primary goal of these programs is to educate youth on abstinence and contraception to prevent pregnancy and STIs, including HIV/AIDS. 42 U.S.C. § 713(b)(2)(A); *id*. § 710(b)(1). Another purpose is to prepare youth for adulthood by teaching subjects such as "[h]ealthy relationships," "[a]dolescent development," "[p]arent-child communication," and "[h]ealthy life skills[.]" 42 U.S.C. § 713(b)(2)(C); *see also id.* § 710(b) (requiring SRAE to educate students on "personal responsibility, self-regulation, goal setting, healthy decisionmaking," and "[t]he foundational components of healthy relationships"). To achieve those goals, Congress requires that PREP and SRAE reach high-risk, vulnerable, and under-represented youth. *See* 42 U.S.C. §§ 713

---

[2] DelGrosso, Schulte, and Zief, *Supporting Statewide Implementation of Evidence-Based Teen Pregnancy Prevention Programs: Findings from Four PREP Grantees*, OPRE Report No. 2016-87, (Nov. 2016), https://acf.gov/sites/default/files/documents/opre/06991_d51_prep_dis_implementation_report_final_508.pdf.

(c)(1), (a)(1)(C)(ii)(II); *id.* § 710(b)(2)(E). The programs must also be culturally "appropriate" and "medically accurate and complete[,]" ensuring that youth of diverse backgrounds receive information that is supported by research. 42 U.S.C. §§ 713(b)(2)(B)(ii), (vi), (e)(2); *id.* § 710(b)(2)(B), (E), (e)(2).

## B. Plaintiff States Have Successfully Implemented PREP and SRAE for Many Years

All Plaintiff States currently participate in PREP. Several Plaintiff States also participate in SRAE. PREP and SRAE grants to states are "formula grants," where allocations are based on certain demographic factors. 42 U.S.C. §§ 710(a)(1)(B), 713(a)(1)(A)(ii). States have significant discretion to design their PREP and SRAE curricula within statutory parameters. *See* 42 U.S.C. §§ 710(b) (SRAE), 713(b) (PREP). For many years, Plaintiff States have dutifully complied with statutory requirements and have implemented highly successful programs.

Participation in PREP is associated with positive outcomes in adolescents' sexual health indicators, behavioral intent, and relationship advocacy.[3] Educators in Plaintiff States report that PREP-funded services are "an invaluable

---

[3] Sandra Anti Eyiah & Adrienne Duke-Marks, *Evaluating Associations of the Personal Responsibility and Education Program (PREP) with Adolescents' Sexual Health and Relationship Advocacy*, 20 Am. J. Sexuality Educ. 1 (2025).

support" and "essential," and caregivers report that PREP-funded workshops are "informative, well-grounded, and [make] common sense." *E.g.*, 7-SER-1689–92, 1697, 1717–18. The most recent PREP data demonstrates that during the 2020-2021 reporting period, just over half of high-school-age and older youth planned to abstain from sex for at least three months because of participating in PREP. 8-SER-2098. Among those who did not plan to abstain, 41% said PREP made them less likely to have sex in the next three months, 65% said they were more likely to use condoms, and 59% said they were more likely to use other forms of birth control. *Id*. Like PREP, SRAE program participants and community members have positive perceptions of the program. Facilitators report that their SRAE programming meets the needs of most youth, and youth participants report that SRAE curricular content is relevant and engaging.[4]

---

[4] Theresa Neelan, et al., *The Sexual Risk Avoidance Education National Evaluation: Understanding Program Implementation Experiences*, OPRE Report 2023-307, at viii (Dec. 2023), https://acf.gov/sites/default/files/documents/opre/SRAENE-NWS-Implementation-2023.pdf.

### C.    Plaintiff States Strive to Ensure that Education Is Inclusive of All Students

Plaintiff States are home to many youth who are transgender, gender-diverse,[5] or have differences in sexual development (DSD).[6] In the United States, approximately 2.8 million people aged 13 and older identify as transgender.[7] While these populations can be underreported, this number includes about 724,000 youth ages 13 to 17, representing 3.3% of all youth nationwide. Herman, *supra*, note 7. Plaintiff States deeply value diversity and strive to make education inclusive for all students. Indeed, an inclusive education is consistent with Plaintiff States' own laws and policies and is supported by experts and educators.

Numerous Plaintiff States have promulgated laws and policies specifically aimed at ensuring inclusivity in sexual health education programs.[8] Many

---

[5] Plaintiffs use "transgender and gender-diverse" to refer inclusively to youth who are nonbinary, two-spirit, genderqueer, and genderfluid, among others.

[6] DSD individuals have atypical combinations of factors that make up one's sex, caused by a number of conditions. 7-SER-1836. They may not fit cleanly into a binary definition of "male" or "female." 7-SER-1840–41. The term "intersex" is sometimes used to describe individuals with DSD. 7-SER-1836.

[7] Jody L. Herman & Andrew R. Flores, UCLA School of Law Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?*, https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/ (last visited Apr. 25, 2026).

[8] *See, e.g.*, Wash. Rev. Code §§ 28A.300.475(1)(a)(i), (c); Colo. Rev. Stat. § 22-1-128(2)(c), (7)(b)(III); N.Y. State Dep't of Educ., *A Guidance Document*

Plaintiff States also have robust antidiscrimination laws that prohibit discrimination on the basis of sex, sexual orientation, or gender identity in schools and other places of public accommodation.[9] These laws are consistent with expert opinion and studies recognizing the importance of inclusive education, particularly sexual health education.[10] *See also* 7-SER-1841–42. For example, studies have noted a decrease in bullying with the provision of gender inclusive health education. Rabbitte, *supra*, note 10. When educators do not provide inclusive sexual health information to transgender, gender-diverse, and DSD youth, "rates of suicidal ideation and suicide are higher," making provision of this information potentially "life-saving[.]" 7-SER-1722–23; *see also* The Trevor Project, 2023 U.S. National Survey on the Mental Health of LGBTQ

*for Achieving the New York State Standards in Health Education* (2005); New York State Dep't. of Educ., *NYSED Assessment Process for Review of Local Education Agencies (LEAs) Condom Availability Plan (CAP) and Approval of the Plan for Training For School Personnel and/or Health Service Personnel Providing Personal Health Guidance to Students* (2017); Or. Admin. R. 581-022-2050(6)(q), (s); Or. Rev. Stat. § 336.455(2)(j).

[9] *See e.g.*, Wash. Rev. Code §§ 49.60.030(1), .040(29); Me. Stat. tit. 5 § 4602; Minn. Stat. § 363A.13; Colo. Rev. Stat. § 24-34-601(2)(a); Haw. Rev. Stat. §§ 368D-1(a), 489-3; N.Y. Const. art. I, § 11(a); N.Y. Exec. Law §§ 291, 292 (35), 296, 300 *et seq.*; N.Y. Civ. Rights Law §§ 40, 40-c; N.Y. Educ. Law §§ 11-12, 801-a, 3201-a; N.Y. Comp. Codes R. & Regs. tit. 9, § 466.13; N.Y. Comp. Codes R. & Regs. tit. 8, § 100.2(l)(2); Mass. Gen. Laws ch. 272, §§ 92A, 98; Mass. Gen. Laws ch. 151B, § 4; Mich. Comp. Laws § 37.2302(a); 775 Ill. Comp. Stat. 5/1-103(O-1), (Q); N.J. Stat. Ann. §§ 10:5-12(f).

[10] Maureen Rabbitte, *Sex Education in School, are Gender and Sexual Minority Youth Included? A Decade in Review*, Am. J. Sexual Educ. 15(4), 530-42 (Oct 13, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7986966/.

Young People (finding that "[r]oughly half of transgender and nonbinary young people found their school to be gender affirming, and those who did reported lower rates of attempting suicide.").

**D.     HHS Abruptly Reversed its Position and Now Seeks to Prohibit PREP and SRAE Grant Recipients from Including "Gender Ideology" in State Curricula**

Plaintiff States' adoption of transgender and gender-diverse inclusive PREP and SRAE curricula was—until now—consistent with the federal government's own directives. As recently as 2024, HHS expressly *required* that States provide programs "to youth populations that are the most high-risk or vulnerable for pregnancies and sexually transmitted infections, including HIV/AIDS, or have other special circumstances including culturally underrepresented youth populations such as . . . youth who identify as lesbian, gay, bisexual, transgender, and/or questioning (LGBTQ+), and other vulnerable or underserved youth populations." 8-SER-2048; *see also* 8-SER-2056 (a 2024 SRAE Notice of Funding Opportunity stated that "States must ensure that SRAE projects are inclusive of youth who identify as lesbian, gay, bisexual, transgender, and/or questioning, intersex, asexual, and two-spirit (LGBTQIA2S+)").

10

This suddenly changed at the start of President Trump's current term. In January 2025, President Trump issued an executive order seeking to eradicate "gender ideology," which he characterized as "permitting the false claim that males can identify as and thus become women and vice versa." Exec. Order No. 14,168; 90 Fed. Reg. 8615, § 2(f) (Jan. 20, 2025) (E.O. 14,168). Soon after, HHS turned its focus to PREP and SRAE.

In April 2025, HHS sent letters to PREP grantees requiring them to submit all approved PREP curricula and programmatic materials for a "medical accuracy review." 1-SER-132–33. Plaintiff States complied and submitted their curricula. *See generally* ER-83–158.

On August 6, 2025, HHS issued a series of Notices of Awards (NOAs) for the grant award period starting October 1, 2024 (*see, e.g.*, 1-SER-214–15 (PREP), 1-SER-248–49 (SRAE)). These NOAs prohibited recipients from including "gender ideology"—a term that was not defined—in any program or service that is funded with the award. *See* 1-SER-214–67. The NOAs' terms and conditions repeat this prohibition, stating that "gender ideology is outside of the scope of the statutory authority for this award." *See, e.g.*, 1-SER-215, 249 (citing 42 U.S.C. § 710 as statutory authority for SRAE and 42 U.S.C. § 713 for PREP). The NOAs warned recipients that the continued use of PREP and SRAE funds

11

"constitutes the grantee's acceptance of the listed terms and conditions." 1-SER-215, 249.

The next day, HHS issued Supplemental Terms and Conditions (Supplemental T&Cs) for PREP and SRAE, which would apply to already awarded PREP and SRAE awards. The Supplemental T&Cs contained the same prohibition and conclusory explanation. 9-SER-2259, 2265. The Supplemental T&Cs are effective immediately, "supersede all previous similar T&Cs[,] and will remain in effect until updated for subsequent awards." 9-SER-2259, 2264.

On August 21, 2025, HHS terminated California's PREP awards and suspended PREP funding in the state after California refused to comply with HHS's demands to remove "gender ideology" from its curricula. 9-SER-2269–74. Five days later, HHS sent PREP grantees in Plaintiff States a letter (the "PREP Directive"), stating that the PREP curricula and program materials for fiscal years 2023, 2024, and 2025 are "outside of the scope of PREP's authorizing statute at 42 U.S.C. § 713" because they include content about "gender ideology." *See, e.g.*, 1-SER-134–38. HHS acknowledged that "these curricula and other program materials were previously approved by [HHS]," but claimed that the "prior administration erred in allowing PREP grants to be used to teach students gender ideology" because "gender ideology is outside of the

12

scope of the authorizing statue." *See, e.g.*, 1-SER-137. It demanded that grantees "remove all content concerning gender ideology from its curricula, program materials and any other aspects of its program delivery within 60 days of receipt of this letter." *See, e.g.*, *id*.

HHS again failed to provide a definition of "gender ideology." Instead, it listed examples of "gender ideology" content. *E.g.*, 1-SER-137. These examples covered a range of material and were sweeping in scope. For example, they included material in teachers' manuals simply instructing educators to foster respectful educational environments. *E.g.*, 1-SER-140 (directing Delaware to remove information instructing facilitators to "[d]emonstrate acceptance and respect for all participants, regardless of personal characteristics, including race, cultural background, religion, social class, sexual orientation or gender identity."). They also included lessons about diversity and inclusivity. For example, HHS prohibited a learning objective that students be able to "[d]emonstrate the respectful use of at least two gender-related terms while discussing student scenarios that illustrate gender diversity with peers and include respectful body language, words, and tone of voice." 1-SER-204.

The examples also included course material directly related to pregnancy and STI prevention. For example, HHS demanded the removal of content that

13

advised "[t]ransmasculine people can get pregnant if they have a uterus." 10-SER-2445. HHS demanded the exclusion of statements recognizing the importance of all youth knowing how to prevent pregnancy and STIs. *E.g.*, 1-SER-206 (directing Washington to remove information from a high school curriculum stating that "[p]eople of all sexual orientations and gender identities need to know how to prevent pregnancy and ST[I]s, either for themselves or to help a friend."); 6-SER-1490 (directing removal of a statement that "sometimes lesbian, gay, bisexual, transgender, and queer or questioning young people don't have access to information and services that is for them. That's why we're here, to spend some time together talking about LGBTQ+ sexual healthcare in particular."). It demanded removal of content informing teachers that a roleplay exercise about "sexual pressure situations" might be "awkward" for some teenagers, including gender-diverse students, and advising that they address this "directly and proactively." 1-SER-135. And it banned content explaining sexual intercourse and stating that "'sex' is so much more than penis-in-vagina intercourse . . . ." 1-SER-178.

In demanding that Plaintiff States immediately implement these changes, HHS never explained how the exclusion of "gender ideology" content furthers Congress's goals in reducing teen pregnancy and STIs and preparing youth for

adulthood. It likewise never considered that gender and sexual minority youth tend to experience increased sexual risk behaviors and adverse health outcomes compared to their heterosexual and cisgender peers,[11] and that failing to provide gender-inclusive, medically accurate information to at-risk youth increases their risk of non-consensual sex, unprotected sex, sex while intoxicated, STIs, and teen pregnancies.[12] Nor did HHS consider the numerous harms that these changes would inflict in Plaintiff States by imposing the impossible choice of losing federal funding for essential public health education programs or complying with unlawful funding conditions.

**E. Plaintiff States Filed Suit and Moved for a Preliminary Injunction to Prevent Numerous Irreparable Harms**

In September 2025, Plaintiff States filed this lawsuit alleging that HHS's sudden and unsupported change in sexual health curricula requirements violates the APA and the U.S. Constitution. ER-194–240. Plaintiff States sought a preliminary injunction against the NOAs, Supplemental T&Cs, and the PREP Directive (collectively the "Gender Conditions"), detailing the numerous irreparable harms that would result absent injunctive relief.

---

[11] *See* 7-SER-1844.
[12] Rabbitte, *supra*, note 10; *see also* 7-SER-1842, 1844.

Plaintiff States explained that HHS's actions put them in the untenable situation of being forced to choose between losing federal funding for essential public health education programs or complying with unlawful funding conditions that undermine the central purpose of the programs and conflict with state and federal laws. *See* ER-191–93.

The termination of PREP and SRAE funding would cause an immediate loss of at least $35 million to Plaintiff States. *See* 10-SER-2514. Plaintiff States submitted evidence that without that funding, their PREP and SRAE programs would be "significantly impaired [in their] ability to deliver medically accurate and complete and culturally appropriate sexual health education services to youth."[13] As a result, many schools and community programs would no longer be able to reliably provide sexual health education services to the youth populations that need them most, including youth in juvenile detention centers, youth in foster care, homeless youth, pregnant or parenting youth, transgender youth, gender-diverse youth, and DSD youth.[14]

---

[13] ER-72; *See also* 1-SER-07, 17, 31; 4-SER-1002; 5-SER-1032, 1061–64, 1115, 1163, 1195–96, 1261, 1285–86, 1306–07; 6-SER-1319, 1338, 1365, 1393–94, 1414, 1442–43, 1574; 7-SER-1603, 1708, 1741.

[14] *See, e.g.*, 6-SER-1393–94 (Connecticut serves youth who are aging out of foster care, homeless youth, youth with HIV/AIDS, victims of human trafficking, pregnant or parenting youth who are under age 21, and youth who live in rural areas or areas with high teen birth rates; without PREP funding,

This would be especially harmful for gender and sexual minority youth whom data shows tend to be at "increased risk for high risk sexual behaviors and negative sexual health outcomes compared to their cisgender peers including decreased condom use, earlier initiation into sex, more sexual partners … higher burdens of sexually transmitted infections, and increased risk of pregnancy in adolescence."[15] Indeed, gender and sexual minority youth are some of the students most at-risk for unplanned pregnancy and STIs.[16] Additionally, studies show that "where inclusive sexual health information isn't provided to gender expansive youth, rates of suicidal ideation and suicide are higher."[17] But even more broadly, this would negatively affect *all* students. Plaintiff States submitted unrebutted expert testimony that a curriculum inclusive of cisgender,

---

Connecticut's state agency and its partners will not be as effective in administering and providing sexual health education); *see also* 5-SER-1025, 1195, 1285–86; 6-SER-1338, 1365, 1413–14, 1442–43, 1574; 7-SER-1603.

[15] *See* 7-SER-1844.

[16] *See* 5-SER-1032, 1061–62, 1115, 1253–54; 7-SER-1694, 1700–01 (services provided by PREP funding is "vital" and without them "youth in our school district, especially high-risk youth, will suffer"); 10-SER-2516, 2519.

[17] 7-SER-1722–23; *see also* Laura Baams, *Sexual and gender diversity in schools: The impact of restrictive education policies on LGBTQ+ adolescent development,* Child Development Perspectives, (January 28, 2026), https://doi.org/10.1093/cdpers/aadaf013. (An increase in inclusive school practices, including inclusive curricula, in the 2000s and 2010s led to LGBTQ+ youth feeling safer in school, less bullying-related victimization, and improved mental health. Recent restrictive education policies "represent a reversal of these gains, reintroducing systemic barriers that threaten the well-being of LGBTQ+ youth").

transgender and gender-diverse youth helps all youth better understand and assess the risks of sexual activity and reduces poor sexual health outcomes. 7-SER-1843–44.

The loss of funding would also jeopardize jobs in Plaintiff States. Many Plaintiff States fund state employee positions with PREP and SRAE grant money, and state agencies would be forced to terminate these positions should funding be cut—in many cases, for programs that were already underway in the midst of a school year.[18] Further, Plaintiff States and their PREP and SRAE program providers rely on access to vital training and technical support from academic researchers and subject matter experts—support that Plaintiffs would lose without proper funding.[19] State agencies reported that the Gender Conditions had already created "immense confusion" and "severely negatively impacted" their ability to plan for the future.[20]

---

[18] *See* 5-SER-1194–95 (1.3 FTEs), 1307 (1.6 FTEs); 6-SER-1337 (1.5 employees), 1393 (1.25 employees), (7 employees), 1442–43 (3 agency employees and 48 positions), 1573 (2 employees); 7-SER-1603 (4.75 FTEs), 1738 (three employees at risk).

[19] 7-SER-1740 (Cardea's training and technical assistance is "a crucially important part of fulfilling PREP program goals"); *see also* 5-SER-1064 (describing the "untenable position of terminating the eleven existing SRAE sub-grantee contracts and the funds already awarded therewith.").

[20] *See, e.g.*, 5-SER-1261; 7-SER-1707, 1738.

Additionally, loss of federal funding for PREP and SRAE programming would result in "a significantly impaired ability to protect the public health," including an increase in long term costs through an inevitable increase in unplanned pregnancy, higher birth rates, and higher rates of HIV and other STIs among young people in vulnerable populations.[21]

On the other hand, complying with the unlawful funding conditions would be equally harmful. Many Plaintiffs States have enacted laws and policies prohibiting discrimination against transgender, gender-diverse, and DSD youth or requiring gender-inclusive educational curricula. *See supra*, notes 8, 9; *see also* 5-SER-1263 (noting that to comply with Gender Conditions requires Maryland to violate state law). Complying with the Gender Conditions would force some Plaintiff States to "violate state anti-discrimination laws and policies." ER-72. They would also effectively prohibit Plaintiff States from effectuating state laws and policies promoting sexual health education that is comprehensive, medically and scientifically accurate, age-appropriate, and

---

[21] ER-67, 72; 5-SER-1163 ("[l]oss of PREP funding would threaten Michigan's historic reductions in teen pregnancy, as the program is central to the state's prevention strategy"); 8-SER-2013 (noting that STIs cost the American healthcare system nearly $16 billion in healthcare costs); 9-SER-2112 ("Pregnancies and STIs pose negative consequences for both the teenagers who experience them and society, including billions of dollars in health care and taxpayer costs").

inclusive of all students, regardless of their protected class status. ER-70–72. This would undermine Plaintiff States' sovereign interests in carrying out their own laws and policies that protect against discrimination, fostering an inclusive environment for all students, and serving underrepresented and at-risk populations including transgender, gender-diverse, and DSD young people.

**F.     The District Court Entered an Injunction Enjoining HHS from Imposing or Enforcing the Gender Conditions and Materially Similar Terms and Conditions**

The district court granted Plaintiff States' motion for injunctive relief in a thorough 77-page Order and Opinion. ER-5–81.

First, the court concluded that Plaintiff States are likely to succeed on the merits of all claims. ER-31–61. With respect to the APA claims, the court determined that Plaintiffs are likely to succeed in showing that HHS acted contrary to law and in excess of its statutory authority because conditioning PREP and SRAE funding on removing gender identity references contradicted Congress's purpose in enacting the programs and the statutory requirements to provide sexual health education that is "medically accurate and complete" and "culturally appropriate." ER-31–42. The court also determined that Plaintiff States are likely to succeed on their claim that imposition of the Gender Conditions was arbitrary and capricious because (1) HHS failed to provide any

20

factual findings or a reasoned basis for its decision, (2) HHS failed to provide any evidence that it considered Plaintiff States' reliance interests, (3) the Gender Conditions violate the government's sex discrimination laws and policies, and (4) HHS failed to offer "any reasonable explanation, other than pretext, for its action." ER-43–54.

With respect to the constitutional claims, the court determined that Plaintiff States are likely to succeed on the separation of powers claim because HHS's imposition of the Gender Conditions "contradicts the express statutory requirements and is unmoored from the statutory purpose." ER-57. It also concluded that Plaintiff States are likely to succeed on their spending clause claim because the Gender Conditions are ambiguous, retroactive, and "deprive Plaintiff States of clear notice and the ability to knowingly and voluntarily accept them." ER-59–60.

Next, the court concluded that Plaintiff States showed that they are likely to suffer irreparable harm absent injunctive relief. ER-61–75. The court found that Plaintiff States provided "an extensive record of the harms that likely will flow from the loss of PREP and SRAE funding" including "(1) an impaired ability to provide public health services; (2) an impaired ability to sustain public health infrastructure and delivery networks; and (3) an impaired

21

ability to protect the public health generally." ER-63. It also found that Plaintiff States provided "substantial record evidence that if they accept their PREP and SRAE awards with the attached Gender Conditions, they will violate state anti-discrimination laws and policies and will likely suffer an inability to protect the public health." ER-72.

Finally, the court concluded that the public interest and equities "tip strongly" in Plaintiff States' favor. ER-77. The court granted Plaintiff States' motion for a preliminary injunction. ER-80–81. Among other things, it enjoined HHS from imposing or enforcing the Gender Conditions "or any materially similar terms or conditions as to any PREP or SRAE funds awarded to Plaintiff States, including any other terms or conditions that require Plaintiff States to remove 'gender ideology,' . . . from their PREP and SRAE curricula or that require Plaintiff States to remove gender identity references from that curricula." ER-80. The scope of injunctive relief does not extend nationwide, but is limited to Plaintiff States. *See id.*

## G.    Proceedings Since Entry of the Preliminary Injunction

Since the entry of the preliminary injunction, the parties have completed cross-motions for summary judgment, which have been fully briefed since March 27, 2026. *See* 2-SER-567–69 (scheduling order set on the docket).

22

Despite the entry of the preliminary injunction, HHS twice imposed conditions on Plaintiff States' PREP and SRAE programs identical to the enjoined Gender Conditions and in violation of the preliminary injunction. First, on January 9, 2026, Plaintiff States received Supplemental T&C's for the PREP program containing language identical to the Gender Conditions that the district court enjoined on October 27. 1-SER-33–44. The conditions were retracted after counsel for Plaintiff States brought the attention of HHS's counsel. 1-SER-33–35, 45–75.

Then again, on January 30, 2026, HHS sought to impose the Gender Conditions through Notices of Awards for the PREP and SRAE programs containing language identical to the enjoined Gender Conditions. 1-SER-33–35, 76–86. And, again, the term was only withdrawn after counsel for Plaintiff States brought the issue to HHS's attention. 1-SER-33–35, 87–129.

## IV.    SUMMARY OF THE ARGUMENT

HHS challenges a single issue on appeal: the breadth of the district court's preliminary injunction. The district court did not abuse its discretion when it enjoined HHS from imposing or enforcing terms or conditions "materially similar" to the Gender Conditions on Plaintiff States' PREP and SRAE-funded curricula. HHS's Gender Conditions prohibit *any* mention of gender identity or so-called

23

"gender ideology" in sexual health curricula, even if directly tied to the core objectives of PREP and SRAE. This included even passing references to the existence of transgender and gender-diverse youth. To ensure HHS cannot re-write its way around the preliminary injunction, especially given the district court's unchallenged factual finding that the Gender Conditions' stated rationale was pretextual, the injunction appropriately reaches "materially similar" attempts to categorically ban such content in Plaintiff States' curricula. In other words, the district court correctly enjoined the same policy from being effectuated in a different guise.

By its own admission, HHS has forfeited all other claims in this appeal, including whether Plaintiff States are likely to succeed on the merits of their claims or whether the district court abused its discretion when it granted injunctive relief. But to the extent HHS suggests otherwise in its argument, the district court properly concluded that a categorical prohibition on "gender ideology" content likely conflicts with the PREP and SRAE enabling statutes. HHS's decision to issue a categorical ban on any mention of gender identity—even if directly raised in the context of pregnancy and STI prevention—is incompatible with Congress's intent in both PREP and SRAE. These statutes seek to educate youth about pregnancy and STI prevention, in a way that is culturally appropriate, reaches

24

diverse youth populations, and is medically accurate and complete. HHS's wholesale elimination of gender identity, without any reasoning or evaluation whatsoever, likely violates these core statutory requirements.

The district court concluded that Plaintiff States were likely to succeed on the merits for all of their claims. Any one of these conclusions could, on its own, support the issuance of the preliminary injunction. And since the district court concluded that the Gender Conditions were likely contrary to law because they forced the Plaintiff States to remove curricular content the PREP and SRAE statutes allowed, any materially similar policy with the same effect would be contrary to law too. Moreover, HHS does not contend with the district court's holding that the Gender Conditions were pretextual, and therefore likely to be reimposed on another pretextual basis. HHS has not met its burden to show that the scope of the preliminary injunction was an abuse of discretion.

## V. ARGUMENT

### A. Standard of Review

The entry and scope of a preliminary injunction is reviewed for abuse of discretion. *Pacito v. Trump*, 169 F.4th 895, 919 (2026); *Alaska Cntr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994). "A district court necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly

erroneous findings of fact." *L.A. Press Club v. Noem*, 171 F.4th 1179, 1186 (9th Cir. 2026) (citation modified).

Factual findings made in connection with motions for preliminary injunction are reviewed for clear error. *Doe v. Snyder*, 28 F.4th 103, 106 (9th Cir. 2022). "Clear error exists if the finding is illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id.* (citation modified).

And while legal conclusions are reviewed *de novo*, *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014), as discussed below HHS has expressly disclaimed any argument in this appeal that the district court erroneously interpreted the law. *See infra* § V.B; *see also* Opening Br. at 8 n.1 (disclaiming any argument the district court's "underlying conclusion that plaintiffs are likely to succeed on the merits" was incorrect). Consequently, no portion of this appeal is subject to *de novo* review. *See Pom Wonderful LLC*, 775 F.3d at 1123.

**B.     The Scope of This Appeal Is Limited to the Breadth of the Injunction; HHS Has Forfeited All Other Claims**

HHS makes clear that the only issue before this Court is whether the district court abused its discretion when it enjoined HHS from imposing or enforcing terms or conditions "materially similar" to the Gender Conditions—

26

not whether Plaintiff States are likely to succeed on the merits of their claims or whether the district court abused its discretion when it granted injunctive relief.

Courts "review only issues which are argued specifically and distinctly in a party's opening brief." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994); *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929–30 (9th Cir. 2003) ("Our circuit has repeatedly admonished that we cannot 'manufacture arguments for an appellant' and therefore we will not consider any claims that were not actually argued in appellant's opening brief").

Here, HHS expressly concedes in its statement of the issues that it seeks review only of the breadth of the preliminary injunction "rather than [the court's] underlying conclusion that plaintiffs are likely to succeed on the merits of their claim that the PREP and SRAE statutes do not authorize the Gender Conditions." Opening Br. at 7 n.1. By expressly disavowing any challenge to the district court's conclusion on the underlying merits, HHS has limited the scope of this appeal to the breadth of the injunction and has forfeited all other claims.

## C. Plaintiff States' Requested Injunction Is Appropriately Tailored

The district court's injunction preventing HHS from enforcing the Gender Conditions "or any materially similar terms or conditions" is appropriately tailored to remedy Plaintiff States' proven irreparable harms and not an abuse of

discretion. HHS effectively concedes that the district court's injunction was proper insofar as it enjoined the Gender Conditions. *See* Opening Br. at 7 n.1, 15. HHS argues only that the injunction is overbroad by ruling that "no limits" could be placed on the inclusion of "gender content." *See* Opening Br. at 20. But this is wrong, and the district court's decision to enjoin "materially similar" unlawful conditions was amply supported by fact and law.

### 1. HHS misconstrues the preliminary injunction

HHS misconstrues the district court's injunction in its effort to characterize it as overly broad. According to HHS, the injunction prohibits it from requiring Plaintiff States to remove *any* reference to gender identity even if the information is wholly irrelevant to the statutory purposes or is medically inaccurate. *See*, *e.g.*, Opening Br. at 31–32. The injunction does no such thing. Rather, the district court enjoined HHS from enforcing a *categorical* prohibition of *all* references to gender identity or so-called "gender ideology" in PREP and SRAE curricula after recognizing that discussing such content might further the statutory purposes. Accordingly, the injunction only reaches "materially similar" attempts to bar such curricular content across the board.

Nothing about the court's injunction prevents HHS from conducting individualized determinations and requesting that States remove medically

inaccurate content from their curricula, presuming, of course, that HHS conducted such a review in good faith. For example, if a state's curricula included instruction that transmen and transmasculine youth *could not* become pregnant, no matter what, that would be medically inaccurate and HHS could require its removal for that reason. HHS could also require the removal of transphobic slurs from PREP and SRAE curricula to ensure that state programs remain inclusive and culturally appropriate. The only thing HHS cannot do under this injunction is require the removal of *all* content about transgender, gender-diverse, or DSD people from PREP and SRAE curricula regardless of the context, purpose, or medical accuracy of the instructional material. HHS remains free to make case-by-case determinations particular to specific instructional materials, so long as those determinations are not mere pretextual attempts to reimplement the Gender Conditions in a different guise.[22]

If the language of the district court's injunction was not clear enough (and it is) the context under which it was ordered resolves all doubt. The meaning of

---

[22] For example, under the district court's injunction HHS could not categorically prohibit all mention of transgender or gender-diverse populations on the theory that there are only "two sexes, male and female, that are not changeable and are grounded in fundamental and incontrovertible reality." *See* ER-11 (quoting E.O. 14,168 § 2) (citation modified). That would merely reimplement the Gender Conditions, which the district court held are likely contrary to law. *See, e.g.*, ER-53 (holding that the Gender Conditions were a pretextual attempt to implement the policy of E.O. 14,168).

29

an injunction is informed by "the circumstances surrounding the injunction's entry: the relief sought by the moving party, the evidence produced at the hearing of the injunction, and the mischief that the injunction sought to prevent." *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 (9th Cir. 1989) (quoting *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972)) (citation modified). Here, the district court entered its injunction after receiving evidence that HHS demanded Plaintiff States remove even passing references to the existence of transgender and gender-diverse youth in every instance in which they appeared, even where those references obviously served the PREP and SRAE statutes' core objectives. *See* ER-14–15 (listing examples of prohibited "gender ideology"); *see also* 10-SER-2445 (HHS prohibited a portion of a curriculum that advised "[t]ransmasculine people can get pregnant if they have a uterus."), 2485 (prohibition on portion of curriculum that advised "[p]eople of all sexual orientations and gender identities need to know how to prevent pregnancy and ST[I]s, either for themselves or to help a friend.").

Accordingly, the district court enjoined HHS's policy of requiring wholesale elimination of curricular content referencing gender identity in its entirety, including mere references to the existence of transgender or gender-diverse students or people without regard to how or why the reference is

30

included. It also enjoined not only the specific terms and conditions implementing the policy HHS had already promulgated, but also materially similar terms and conditions that HHS might impose in the future to require that Plaintiff States remove all "gender ideology" or "gender identity references." *See* ER-80. This was appropriate because the Plaintiff States challenged HHS's underlying policy, "not the piece of paper that contained it." *New York v. Trump*, 171 F.4th 1, 16 (1st Cir. 2026). The court correctly found the categorical policy—regardless of the specific language HHS used—was likely contrary to law and would cause irreparable harm to the Plaintiff States if not enjoined (conclusions that HHS does not challenge here). *See generally* ER-5–81.

### 2. The injunction against "materially similar" policies was supported by fact and law and not an abuse of discretion

The district court had good reason to enjoin HHS from enforcing or implementing any materially similar condition. HHS had already tried to enforce the Gender Conditions through multiple means including notices of awards for PREP and SRAE grants, and through supplemental terms and conditions. Among the many unchallenged findings of the district court is the finding that HHS's claimed basis for imposing the Gender Conditions was pretextual and "the real reason behind HHS's Gender Conditions is to implement the administration's policy objectives set out in E.O. 14,168." ER-53. The district

31

court found that the medical accuracy review initially demanded by HHS was merely a smokescreen for HHS to enact a wholesale erasure of transgender and gender-diverse students. *Id.* ("But after HHS discovered that curricular materials that reference gender identity would survive a medical accuracy review, it then invented a second pretext—that 'gender ideology is outside the scope of the authorizing statute.'"). HHS does not challenge this finding and, in fact, HHS appears to confirm its pretextual actions when it asserts that it initiated the medical accuracy review after it "developed concerns" that state curricula had "strayed" from "statutory moorings by incorporating instruction on *ideologically charged* topics," suggesting that the difference in policy objectives or "ideology," rather than accuracy or some other statutory-based factor, was the real reason HHS requested a medical accuracy review in the first place. *See* Opening Br. at 19 (emphasis added).

HHS's later actions confirm the necessity of the preliminary injunction, as HHS continued to insert language identical to the enjoined Gender Conditions in Plaintiff States' PREP and SRAE terms and conditions, only removing it when counsel pointed out that this violated the injunction. 1-SER-33–129. If the district court had limited its injunction to only the particular instantiations of the Gender Conditions HHS had imposed prior to obtaining the preliminary

32

injunction, Plaintiff States would have been forced to go back to court to seek additional preliminary relief for challenged conditions with the same language and imposed on the same programs by the same defendants. Injunctions should not be this easy to flout.

For this reason, courts around the country have regularly entered injunctions against challenged policies as well as materially or substantially similar policies to facilitate judicial efficiency and prevent legal games of whack-a-mole. *See, e.g.*, *New York*, 171 F.4th at 14 (largely affirming a preliminary injunction enjoining federal agency defendants from freezing federal funds based on an Office of Management and Budget directive "*or any other materially similar* order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress") (emphasis added); *R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180 (D.R.I. 2025) (entering injunction enjoining defendants from enforcing challenged requirements "or any substantially similar requirement"); *Illinois v. Noem*, 813 F. Supp. 3d 282, 313 (D.R.I. 2025) (enjoining FEMA "from enforcing by any means against Plaintiffs and their instrumentalities and subdivisions" challenged grant award terms "or any materially similar terms"); *Martin Luther King, Jr. Cnty. v. Turner*, 798 F.

33

Supp. 3d 1224, 1240 (W.D. Wash. 2025) (enjoining HUD from imposing or enforcing challenged funding conditions "or any materially similar terms or conditions"); *Hous. Auth. of City & Cnty. of San Francisco v. Turner*, No. 25-cv-08859-JST, 2025 WL 2961794, at *2 (N.D. Cal. Oct. 18, 2025) (similar); *Oregon v. Kennedy*, No. 6:25-cv-02409-MTK, 2026 WL 1048354, at *18–20 (D. Or. April 18, 2026) (granting injunction against a declaration made by the Secretary of HHS "or any materially similar policy").

The cases HHS relies on for its argument that the district court's injunction is impermissibly broad offer no support because in those cases, the challenged injunctions were materially broader in scope or context than was necessary to provide the plaintiffs relief. For example, in *Church of the Holy Light of the Queen v. Holder*, 443 F. App'x 302, 303 (9th Cir. 2011), the Ninth Circuit vacated an injunction it determined was overbroad because the injunction "reach[ed] more conduct than that which the district court held violated [the Religious Freedom Restoration Act]." There, the district court's injunction enjoined the federal government from enforcing certain regulations in the Controlled Substances Act, though "plaintiffs repeatedly represented to the court and in discovery that they were not challenging any CSA regulations and had 'not alleged in the Complaint that the CSA violates their rights.'" *Id.*

34

A comparable issue arose in *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1184 (9th Cir. 2024), where the district court enjoined a state agency from authorizing wolf trapping and snaring for recreational purposes within a specific geographical area and time period. On appeal, the plaintiffs agreed that the injunction could be clarified to establish that it wasn't meant to cover wolf trapping and snaring for government research, and so the Ninth Circuit vacated the injunction "to the extent that it prevents the State from trapping and snaring wolves for research purposes[.]" *Id.* at 1197. By contrast, here, Plaintiff States explicitly challenged the Gender Conditions, the district court agreed that they were likely to violate the APA many times over (a conclusion HHS does not challenge), and so the district court appropriately enjoined HHS from giving any effect to the Gender Conditions and materially similar terms and conditions that would have the same effects. The district court did not enjoin unchallenged regulations or unrelated conduct—but instead the *same* policy from being effectuated in the same context, but in a different guise.

HHS's reliance on *Meinhold v. Department of Defense*, 34 F.3d 1469 (9th Cir. 1994), and *Gulf Oil Corp. v. Brock*, 778 F.2d 834 (D.C. Cir. 1985), fares no better. *Meinhold* addressed a nationwide injunction against the Department of Defense, which the Ninth Circuit vacated because the case was "not a class

action," and the individual plaintiff "sought only to have his discharge voided and to be reinstated." 34 F.3d at 1480. Here, however, the district court's injunction is limited to the Plaintiff States—an injunction "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Similarly, in *Gulf Oil*, a government contractor sued to prevent the FOIA disclosure of a specific affirmative action plan, the district court enjoined disclosure of that document and all "substantially similar documents," and the requesting party later withdrew its request for the specific plan. 778 F.2d at 835. The D.C. Circuit concluded the case was moot and the injunction was overbroad because the dispute wasn't about the agency's disclosure regulation but the application of that regulation to a particular document that was no longer being requested. *Id.* at 842–43. Here, by contrast, the district court's injunction is tailored to remedy the threat of ongoing harm established by Plaintiff States: irreparable injury to their operation of PREP and SRAE curricula (a finding that, again, HHS does not challenge). *See* ER-61–72 (finding Plaintiff States likely to suffer irreparable injury in the absence of a preliminary injunction).

Finally, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 147 (2010), offers no support for HHS's position. There, the district court found that a

36

decision by the Animal and Plant Inspection Service, a component of the Department of Agriculture, to totally deregulate a genetically modified crop violated certain procedural requirements of federal law. In addition to vacating the challenged decision for its procedural defects, however, the district court enjoined any future efforts to deregulate the crop, even partial deregulation that would have no impact on the plaintiffs. *Id.* at 156–57, 161–62. "In light of [those] particular circumstances" the Supreme Court held the district court abused its discretion. *Id.* at 164. Here, the district court held that HHS's policy to ban any mention of gender identity or transgender or gender-diverse people was contrary to law and caused Plaintiff States irreparable harm. *E.g.*, ER-77–78. The injunction does not prohibit HHS from taking some as-yet unknown action that may or may not injure Plaintiff States. It enjoins HHS from reimplementing the exact same harmful and unlawful policy by using different implementing language.

HHS has not shown that the district court abused its discretion by enjoining the Gender Conditions and any materially similar terms and conditions. But even if it had, HHS's request that the district court's injunction should be "vacated" in its entirety (Opening Br. at 18) is without basis. As explained above, the injunction is appropriately tailored to remedy Plaintiff

37

States' harms, but even if the Court accepts all of HHS's arguments, the most that the Court should order is modification of the preliminary injunction to narrow it. *See Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th 1180 at 1197 (vacating only those parts of an injunction that were overbroad, and remanding for consideration by the district court).

The district court appropriately tailored the preliminary injunction to enjoin HHS's Gender Conditions as well as "materially similar" terms and conditions that accomplish the same things. This Court should affirm the injunction.

**D. A Categorical Prohibition on "Gender Ideology" Content Conflicts with the PREP and SRAE Enabling Statutes**

**1. This Court should disregard HHS's statutory arguments as beyond the scope of the appeal**

Despite expressly disavowing any challenge to the district court's conclusion on the underlying merits, HHS devotes a large portion of its brief to arguing that the preliminary injunction "miscon[s]trues the PREP and SRAE statutes." Opening Br. at 22. It likewise argues that the district court incorrectly "prejudged" whether the content included in Plaintiff States' PREP and SRAE curricula is medically accurate and culturally appropriate. *Id.* at 25.

38

To the extent these arguments attack the district court's decision to grant injunctive relief, this Court should decline to consider them based on HHS's express limitation of its own appeal, stating that it is not challenging the court's conclusion that Plaintiff States are likely to succeed on the merits of their claims that the PREP and SRAE statutes do not authorize the Gender Conditions. *Id.* at 7 n.1.

Moreover, these arguments should be disregarded to the extent they are aimed at challenging the scope of the injunction because they are not sufficiently developed. HHS does not in any way connect its statutory arguments to the only issue on appeal—whether the injunction is overly broad. Instead, HHS rehashes its arguments that the Gender Conditions are permissible and faults the district court for not explaining how every curricula example falls within the scope of the PREP and SRAE statutes. *Id.* at 17–21. Repeating arguments previously made—while completely failing to explain why they justify the relief requested—is insufficient to show error, let alone an abuse of discretion. *See Indep. Towers of Wash.*, 350 F.3d at 929–30 ("[O]ur circuit has repeatedly admonished that we cannot 'manufacture arguments for an appellant'"); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("[J]udges are not like pigs, hunting for truffles buried in briefs.").

39

### 2. HHS's statutory arguments fail on their merits

Moreover, HHS's statutory arguments fail because the district court properly concluded that the Gender Conditions' prohibition on any and all "gender ideology" content is likely contrary to the PREP and SRAE enabling statutes. HHS does not—and cannot—establish otherwise. The enabling statutes give states significant discretion to include content addressing the needs of transgender and gender-diverse youth, so long as it falls within broad statutory parameters. Nothing in the enabling statutes supports a categorical ban on all "gender ideology" content, particularly one so sweeping that it prohibits statements recognizing the very *existence* of transgender, gender-diverse, and DSD youth.

On the contrary, a categorical ban of all gender-related content flatly contradicts the enabling statutes in at least three ways. First, it conflicts with Congress's intent to educate youth about pregnancy and STI prevention. Second, it conflicts with statutory requirements that programs be culturally appropriate. And third, it conflicts with statutory requirements that programs be "medically accurate and complete."

First, as the district court recognized, PREP is broadly "designed to educate adolescents on . . . both abstinence and contraception for the prevention

40

of pregnancy and sexually transmitted infections, including HIV/AIDS . . . ." 42 U.S.C. § 713(b)(2)(A); ER-8. Similarly, SRAE is designed to enable states "to implement education exclusively on sexual risk avoidance (meaning voluntarily refraining from sexual activity)" and provides that states may offer some education regarding contraception. 42 U.S.C. §§ 710(b)(1), (4)(B). The plain language of these provisions unambiguously demonstrates Congress's intent to allow content that educates adolescents on pregnancy and STI prevention.

Yet a categorical prohibition on all "gender ideology" content would forbid content that—on its face—serves that exact purpose. This is evident simply by looking at the content that HHS identified as impermissible. For example, HHS demanded that Plaintiff States remove language that "[p]eople of all sexual orientations and gender identities need to know how to prevent pregnancy and STOs [sic], either for themselves or to help a friend." 10-SER-2506. HHS likewise commanded that Plaintiff States remove language from a facilitator's introduction recognizing that "sometimes lesbian, gay, bisexual, transgender, and queer or questioning young people don't have access to information and services that is for them. That's why we're here, to spend some time together talking about LGBTQ+ sexual healthcare in particular." 6-SER-

41

1490. HHS has not provided any plausible argument that requiring *removal* of this content is consistent with the statutes' objectives to educate adolescents on pregnancy and STI prevention.

In addition, the removal of such content is also contrary to unrebutted expert testimony and academic literature. As one expert testified, "[e]ducation about gender identity is integral to teaching about sexual health including abstinence and contraception." 7-SER-1842; s*ee also generally*, Rabbitte, *supra*, note 10; *see also* 7-SER-1844 (if PREP and SRAE-funded programs "incorrectly insist that sex and gender are binary, they cannot adequately educate transgender and gender diverse adolescents or adolescents with DSD in accordance with the PREP and SRAE enabling statutes.").

Second, a categorical prohibition on all "gender ideology" content conflicts with Congress's requirement that PREP and SRAE curricula be "culturally appropriate" and reach diverse youth populations. ER-42–43. The PREP statute requires that programs be "provided in the cultural context that is most appropriate for individuals in the particular population group to which [the program is] directed." 42 U.S.C. § 713(b)(2)(B)(vi); *see also id.* § 713(c)(1) (reserving funds to target "high-risk, vulnerable, and culturally under-represented youth populations"); *id.* § 713(a)(1)(C)(ii)(II) (requiring

42

applications to describe the State's plan for meeting its goals "especially among youth populations that are the most high-risk or vulnerable"). The SRAE statute similarly requires grantees to present information that is "culturally appropriate, recognizing the experiences of youth from diverse communities, backgrounds, and experiences." 42 U.S.C. § 710(b)(2)(E).

As the district court correctly recognized, "[i]t is evident from the statutes' purpose, from its requirement to provide a 'culturally appropriate' curricula, and its attention to high-risk youth populations, that Congress sought to expand the programs' reach, not contract it by excluding certain segments, especially high-risk segments, of a states' youth population, as HHS seeks to do." ER-42–43. Transgender, gender-diverse, and DSD youth fall squarely within these targeted populations. Indeed, HHS's own website specifically states that PREP programs target youth "from minority groups (including sexual minorities)[.]" *See* 8-SER-2036. And unrebutted evidence establishes these groups' heightened vulnerability and risk. *See, e.g.*, 7-SER-1844 ("[g]ender minority youth are at increased risk for . . . decreased condom use, earlier initiation into sex, more sexual partners, using drugs or alcohol prior to sex, higher burdens of [STIs], and increased risk of pregnancy in adolescence"); 7-SER-1722–23 (explaining that when inclusive sexual health information is not provided to transgender,

43

gender-diverse, and DSD youth, "rates of suicidal ideation and suicide are higher[.]"); *see also* Rabbitte, *supra*, note 10 (noting increased sexual risk behaviors and adverse health outcomes for gender minority youth)

HHS does not—and cannot—dispute that the Plaintiff States' populations include transgender, gender-diverse, and DSD youth. Accordingly, "the particular population group to which [the program is] directed[,]" 42 U.S.C. § 713(b)(2)(B)(vi), necessarily includes youth from these populations. Congress's mandate to "recogniz[e] the experiences of youth from diverse communities, backgrounds, and experiences" *Id.* § 710(b)(2)(E) likewise compels recognition of these populations. Yet HHS prohibited content allowing transgender, gender-diverse, or DSD students to attend sex education classes with their preferred name, pronouns, or physical presentation, or allowing educators to respond in an affirming manner to a student's questions about their transgender, gender-diverse, or DSD family members, classmates, or community members. *E.g.*, 1-SER-135, 140, 150, 189 (prohibiting language directing facilitators to "[d]emonstrate acceptance and respect for all participants, regardless of . . . gender identity"); 1-SER-184, 206. (demanding removal of statements that "[i]t is important for educators to routinely teach inclusively, as every classroom will likely have students who identify (or will later identify) as

44

LGBTQ, as well as students with family and friends who identify as LGBTQ."). This content, too, unquestionably aligns with the statutory objectives and purpose, proving that a categorical prohibition on all "gender ideology" content is unlawful.

Third, a blanket prohibition on "gender ideology" content conflicts with the statutes' requirements that PREP and SRAE programs be "medically accurate and complete." ER-38–50. Congress expressly required that PREP and SRAE curricula be "medically accurate and complete," which is defined as "verified or supported by the weight of research conducted in compliance with accepted scientific methods" and either "(A) published in peer-reviewed journals, where applicable;" or "(B) comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 42 U.S.C. §§ 713(b)(2)(B)(ii), (e)(2); *id.* §§ 710(b)(2)(B), (e)(2).

As the district court correctly observed, the Supreme Court itself just acknowledged that "1.6 million Americans over the age of 13 identify as transgender, meaning that their gender identity does not align with their biological sex." *United States v. Skrmetti*, 145 S. Ct. 1816, 1824 (2025). Further, the near unanimous consensus of the medical and scientific community is that

45

gender identity is distinct from sex, and including gender identity in comprehensive sexual health education is recommended by the American Academy of Pediatrics and the American College of Obstetricians and Gynecologists. 7-SER-1838–39, 1842–43. For this additional reason, a categorical ban on all "gender ideology" content is contrary to the PREP and SRAE enabling statutes.

HHS appears to claim that the district court improperly considered the statutory requirements that PREP and SRAE programs be "culturally appropriate" and "medically accurate and complete" because HHS had not yet considered whether Plaintiff States' curricula satisfied those requirements. *See* Opening Br. at 30-31. But contrary to HHS's assertion, the district court did not "prejudge . . . whether the gender content included in plaintiffs' PREP and SRAE curricula is medically accurate and culturally appropriate." *Id.* at 30. At no point in its order did the district court make individualized determinations about whether specific curricula met the statutory requirements. Instead, it merely evaluated whether HHS's categorical prohibition on *all* content referencing gender identity or gender diversity—such as one denying the existence of transgender youth—conflicted with the PREP and SRAE statutes. ER-39–40. Nothing about the court's ruling "usurped" HHS's authority.

46

Moreover, the district court properly considered these statutory requirements when considering Plaintiff States' claims that HHS's actions violated the APA and the Constitution. These statutory requirements were relevant to evaluating (and rejecting) HHS's argument "that the concept of gender identity 'fall[s] outside the core medical and biological content that is central to sexual-risk education." ER-39. They were likewise relevant when determining that the Gender Conditions are contrary to law and arbitrary and capricious. As the district court explained, "Congress expressly directed that the determination of what is 'medically accurate and complete' lies not with the agency but with the weight of scientific evidence-based peer-reviewed research and leading professional organizations with relevant expertise in the field." ER-25 (citing 42 U.S.C. § 713(e)(2) and § 710(e)(2)). Yet HHS failed to consider *any* scientific research or medical consensus publicly available at the time it imposed the Gender Conditions. Consideration of these statutory factors was both proper and necessary to evaluating Plaintiff States' claims.

HHS also implies that it need not have considered scientific research and medical consensus that Plaintiff States included in a declaration because the declaration was provided after HHS's decision. *See* Opening Br. at 30–31 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020);

47

*Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)). But the point of providing those sources is to show that HHS could have evaluated the scientific literature and medical consensus that was publicly available at the time but chose instead to entirely ignore it. *See* 7-SER-1836–45. Because HHS "entirely failed to consider" an essential component of PREP and SRAE, the district court was correct in determining HHS likely violated the APA. See *Regents*, 591 U.S. at 30.

HHS next references specific curricula examples and faults the district court for not explaining how such content is consistent with the PREP and SRAE statutory directives. Opening Br. at 23–36. But because the district court was evaluating the legality of HHS's policy to ban all "gender ideology" content regardless of its context or purpose, it was under no obligation to discuss every curricula example that HHS targeted. Any claim to the contrary flips the analysis on its head. Plaintiff States' demonstration of how *any* of the prohibited content fits within the scope of the enabling statutes necessarily establishes that HHS's categorical ban on "gender ideology" content is improper. But that does not make the converse true. Even if HHS could justify the exclusion of some of the identified content—which it cannot—that in no way establishes that its *categorical ban* on *all* "gender ideology" content was permissible.

48

Regardless, HHS's cited examples do not establish that the court's injunction is improper. HHS first points to a lesson about "respecting diversity," which states that "[i]deas about what gender behavior is appropriate change in different cultures and at different times in history. Sometimes one gender is given more power or status than another." Opening Br. at 23–24 (citing ER-85, ER-89, ER-98, ER-106, ER-115, ER-119, ER-123, ER-129, ER-139, ER-160). HHS claims these "historical and sociological topics" are unrelated to pregnancy and STI prevention or any of the "adult preparation subjects" and thus cannot be funded by PREP and SRAE. Opening Br. at 24.

But HHS's bald assertion completely ignores that the "adult preparation subjects" plainly allow for discussion on "historical and sociological topics." PREP permits education on topics such as "the development of healthy attitudes and values about . . . racial and ethnic diversity, and other related subjects[;]" "healthy relationships, including marriage and family interactions[;]" and "[h]ealthy life skills, such as . . . communication and interpersonal skills, and stress management." 42 U.S.C. § 713(b)(2)(C). Similarly, SRAE permits education on "healthy decisionmaking, and a focus on the future" and "[t]he foundational components of healthy relationships and their impact on the formation of healthy marriages and safe and stable families" among other

49

subjects. *Id.* at §§ 710(b)(3)(A), (D). It is not a stretch to say that education about gender power dynamics and different cultures is relevant to learning about diversity, communication and interpersonal skills, and healthy decisionmaking.

HHS also points to one of the District of Columbia's PREP lesson plans that prompts the instructor to "[m]ention that there are 20 states where there are no explicit laws against discrimination based on sexual orientation or gender identity in state law. This means, for example, you can be fired if you are part of the LGBTQIA+ community." 2-SER-473–74; *see* Opening Br. at 24. The lesson then transitions to a discussion of "discrimination conversation questions," which encourage students to consider discrimination related to sex, gender, race and ethnicity. 2-SER-473–74. Students are then taught about allyship and instructed that allyship includes listening and being open-minded, respecting privacy, and confronting your own prejudice and bias. 2-SER-474–75. On its face, this lesson clearly relates to several adulthood preparation subjects, including "racial and ethnic diversity," "healthy relationships," and "communication and interpersonal skills." 42 U.S.C. § 713(b)(2)(C)(ii). It, too, is within the scope of the statute.

In short, HHS not only fails to justify the exclusion of individual curricula examples but also fails to explain how the statutes even remotely support a

categorical ban on *all* "gender ideology" content. Even if it could, however, HHS ignores that the injunction would still be supported by the multiple *other* bases upon which the district court relied. These include that the Gender Conditions are arbitrary and capricious because (1) HHS did not provide "factual findings or a reasoned basis for its decision" (ER-45); (2) HHS changed its position without adequately explaining why and disregarded Plaintiff States' legitimate reliance interests (ER-46–51); (3) the Gender Conditions violate 42 U.S.C. § 708 (ER-51–52); and (4) HHS's stated reason for implementing the Gender Conditions was pretextual (ER-52–53). They also include the district court's conclusion that the Gender Conditions violate the Spending Clause and separation of powers. ER-54–60. Any one of these holdings, which HHS does not contest in anything other than a footnote (Opening Br. at 32–33 n.6), provide sufficient basis for the preliminary injunction's entry and scope. *See City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010) (appellant waived claim by failing to address the issue in its opening brief except in a footnote).

## VI.   CONCLUSION

The Gender Conditions are unlawful, unconstitutional, and harmful. And to ensure HHS cannot re-write its way around the preliminary injunction, especially

given the district court's unchallenged factual finding that the Gender Conditions' stated rationale was pretextual, the injunction appropriately reaches "materially similar" attempts to categorically ban all gender identity content in Plaintiff States' curricula. This Court should affirm the preliminary injunction in its entirety.

RESPECTFULLY SUBMITTED this 27th day of April 2026.

NICHOLAS W. BROWN
Attorney General

*s/ William McGinty*
WILLIAM MCGINTY
KELLY PARADIS
Deputy Solicitors General
LUCY WOLF
ALEXIA DIORIO
MOLLY POWELL
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
william.mcginty@atg.wa.gov
kelly.paradis@atg.wa.gov
lucy.wolf@atg.wa.gov
alexia.diorio@atg.wa.gov
molly.powell@atg.wa.gov

*Counsel for State of Washington*

DAN RAYFIELD
Attorney General of Oregon

ROBERT A. KOCH
GREG ALLEN RIOS
1162 Court Street, NE

52

Salem, OR 97301
971-673-1880
Gregory.A.Rios@doj.oregon.gov
Robert.A.Koch@doj.oregon.gov
*Counsel for State of Oregon*


KEITH ELLISON
Attorney General of Minnesota

LINDSEY E. MIDDLECAMP
Office of the Minnesota Attorney
General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-300-0711
lindsey.middlecamp@ag.state.mn.us
*Counsel for State of Minnesota*


PHILIP J. WEISER
Attorney General of Colorado

DAVID MOSKOWITZ
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6086
david.moskowitz@coag.gov
*Counsel for State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

ANDREW M. AMMIRATI
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106

53

860-808-5090
Andrew.Ammirati@ct.gov
*Counsel for State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
vanessa.kassab@delaware.gov
*Counsel for State of Delaware*

BRIAN L. SCHWALB
Attorney General of District of
Columbia

SARAH W. CARROLL
CAROLINE S. VAN ZILE
400 6th Street, NW, Suite 10100
Washington, D.C. 20001
202-735-6637
sarah.carroll@dc.gov
caroline.vanzile@dc.gov
*Counsel for District of Columbia*

ANNE E. LOPEZ
Attorney General of Hawai'i

DAVID D. DAY
Deputy Attorney General
KALIKO'ONĀLANI D. FERNANDES
Deputy Solicitor General
425 Queen Street
Honolulu, HI 96813

54

808-586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
*Counsel for State of Hawai'i*

KWAME RAOUL
Attorney General of Illinois

SARAH A. HUNGER
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
sarah.hunger@ilag.gov
*Counsel for State of Illinois*

AARON M. FREY
Attorney General of Maine

SARAH FORSTER
Assistant Attorney General
111 Sewall Street, 6th Floor
6 State House Station
Augusta, ME 04333-0006
207-626-8800
sarah.forester@maine.gov
*Counsel for State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

LAUREN GORODETSKY
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7057
lgorodetsky@oag.state.md.us

55

*Counsel for State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

ALLYSON SLATER
Director, Reproductive Justice Unit
1 Ashburton Place, 20th Floor
Boston, MA 02108
617-727-2200
allyson.slater@mass.gov
morgan.carmen@mass.gov
*Counsel for Commonwealth of Massachusetts*

DANA NESSEL
Attorney General of Michigan

NEIL GIOVANATTI
DANIEL JOHN PING
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov
PingD@michigan.gov
*Counsel for State of Michigan*

JENNIFER DAVENPORT
Attorney General of New Jersey

GEOFFREY MCGEE
*Deputy Attorney General*
25 Market Street, 8th Floor
Trenton, NJ 08625
609-696-5279

56

Geoffrey.McGee@law.njoag.gov
*Counsel for State of New Jersey*

LETITIA JAMES
Attorney General of New York

GALEN LEIGH SHERWIN
Special Counsel for Reproductive
Justice
28 Liberty Street
New York, NY 10005
212-426-5667
galen.sherwin@ag.ny.gov
*Counsel for State of New York*

PETER F. NERONHA
Attorney General of Rhode Island
State of Rhode Island

RILEY M. O'BRIEN
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
robrien@riag.ri.gov
*Counsel for State of Rhode Island*

JOSHUA L. KAUL
Attorney General of Wisconsin

AARON J. BIBB
Assistant Attorney General
Wisconsin Department of Justice
PO Box 7857
Madison, WI 53707-7857
608-266-0810
aaron.bibb@wisdoj.gov
*Counsel for State of Wisconsin*

57